v. Warren Pumps, LLC, et al. Good morning, Your Honors, excuse me, my name is Michael Shea and I represent Raymond Murray in this action on this appeal and I would start out by saying that one of the areas in dispute that I think is obvious is the termination itself in this case. The company maintains that Mr. Murray quit his employment at Warren Pumps and my client maintains that he was told shortly after he complained about very serious safety violations as well as on May 27th that he was unhappy with his job. Quote unquote unhappy with his job. The only evidence of unhappiness in this case, Your Honors, is the fact that Mr. Murray complained and those complaints of safety issues intensified right up until the time that he was terminated and they escalated and culminated in a complaint to corporate about the welding of the US submarine pumps, the defective welding. Corporate came up and quote investigated that issue, said there was nothing wrong, and basically pulled him in to a termination meeting and terminated his employment. Well supported by the case law is the wrongful termination claim based on violation of public policy. And that policy is rooted in several areas of the law. One is that he complained about a very serious number of violations of the electrical code. Mr. Banus, a man doing electrical work in violation of the electrical code and statutes and Mr. Murray on numerous occasions complained that he shouldn't be doing that work unsupervised while Mr. Murray is not at the company. And so that is one basis of the violation of public policy claim. Another is the complaints that he made about OSHA. He made several complaints, and not just the day-to-day normal complaints that a safety inspector might highlight or bring to the company's attention, but very serious safety violations where employees were experiencing actual physical symptoms, very serious symptoms. He complained about that as well. How do we factor into this calculus the nature of Mr. Murray's position? In a normal case, some inference can be drawn from closeness in time between an employee complaining about an alleged safety violation and the termination of the employee's employment. But that calculus is different in the case of someone who's a safety officer and whose job, in effect, whose job description, in effect, requires him to look for and to report complaints about safety matters. How do we, how do we, so it seems unfair, since that's the requisite of his job, and since we don't want to perpetuate a rule that would say all safety officers are frozen in place and the employer can never fire them because they're making, they're registering complaints about safety matters all the time, what kind of rule can be devised to distinguish between the safety officer who gets fired because the employer doesn't want to hear about the safety complaints that it's the employee's job to report, and the safety officer who gets fired because he's not doing the job of a safety officer, he's reporting things that shouldn't be reported and wasting everybody's time. What sort of rule of law can we devise that will distinguish between those two poles? One point, Your Honor, is that in this case, these were not routine safety complaints or issues raised by Mr. Murray. These were very serious complaints, out-of-bounds complaints, Your Honor. Yeah, but out-of-bounds complaints cuts both ways. From his point of view, maybe they were very serious safety matters. From the employer's point of view, maybe they were just matters that you shouldn't have been raised at all, that they were, you know, whimsical or that, you know, I mean, if an employer has a safety officer who is seeing ghosts under every bed, you know, how does an employer deal with that without getting hung up by some artificial inference? I can't believe this is the first case in which a safety officer has been discharged and has claimed that he was discharged because he was bringing the complaints to the employer's attention, and I'm struggling to learn how courts handle this kind of unusual dilemma. Well, Your Honor, one case that I found is the Norris case. I cite that case in my brief. The Norris is a First Circuit case, and unfortunately, it wasn't a summary judgment case. It was a 12-B-6, I believe, motion, and Norris was a safety officer, worked inspecting nuclear power plants, and frankly, the issue that you're raising never came up in that case, but the court let the plaintiff go forward with a violation of public policy claim, notwithstanding the fact that this was a safety officer, notwithstanding the fact that this was a safety officer, but as you say, that's on motion to dismiss where you don't really need to do much except make the allegation. And I think in this case, Your Honor, to try to answer your question, I think there's, you can't help but have to look at the complaints themselves and the severity of them and how they are, they can be outside the normal bounds of safety complaints, and I'll state one example. The complaints of violating the electrical code in statutes are not just routine complaints, one, because it was Murray's license that was at stake, and Can you clear up something for me so that I can understand the case a little better? Sure. Some of these complaints are made to Corsic. Some of them are made to Belecto. Belecto is an employee of a different company, Colfax Americas. What's the relationship between them? Oh, no, they're all in the same organization, essentially, Your Honor. Well, explain it, please. I don't know if I can explain it very specifically, Your Honor, but Colfax is a parent company of Warren Pumps, and Belecto worked for, I believe it was the same entity that my client worked for, but they're, Warren Pumps, my understanding, is a wholly owned subsidiary of Colfax. When you say you believe they worked for the same company, what do you mean? You mean you believe the record will bear that out, or you just think they did? I think the record will bear that out, Your Honor, because Belecto is an HR person. She was frequently at Warren Pumps' plant, and she's intimately involved with this, so, but in any event, I think if we look at the actual and how nothing was done to correct these safety issues, after numerous complaints by Mr. Murray, I think that puts this in a category of, even though he's a safety inspector, he's complaining about very serious issues, and then immediately after that gets terminated for complaining about these issues. Is there any, not that it's necessarily a crime, is there any direct evidence that that's why he was terminated? I think the best evidence, Your Honor, is these complaints escalated in April and May, just before his termination on June 1st, 2011. Yeah, he didn't get this job for two months, and I understand this very close temporal proximity. That would normally give rise to an inference, but the short length of the employment could equally well give rise to an inference that they tried him at this job, he wasn't up to doing it, so they fired him. And the fact that the complaints, as you put it, are out of bounds, could cut either way. That either they were very serious, or they were matters that didn't stand up to examination. And what I'm struggling for is, is there some evidence in the record that would help a fact finder choose between those two inferences, which appear to me on their face to have at least equally persuasive force? Yes, I think the best evidence, Your Honor, is the nature of the complaints. Yeah, but as I said, I think that cuts both ways. And the fact that they told him shortly after he called corporate and corporate came up to investigate, they told him that he was unhappy with his job and he was terminated. I mean, I think that goes to the causation issue, and I think a jury could probably, on their own, determine whether, you know, I suppose the defense would be, that's his normal job responsibility. But a jury, it seems to me, should be able to weigh whether he was within the scope of his job and doing nothing more and not complaining more than his normal job duties would require or not. But it seems to me that the bottom line is these, the complaints that he made are very serious complaints, and shortly thereafter, he's gone. Counsel, do you want to spend a moment on your hostile work environment claim? Sure. The, as I understand it, I mean, Judge Woodlock did find that, at least under the federal standard for your ADA claim, that a jury could conclude that he was disabled, but felt that you would not be able to establish that, on the basis of that disability, he was subject to a hostile work environment. He seems to take, Judge Woodlock seems to take the view that the hostile environment claim essentially consisted of a few comments, which could be viewed as hostile, but really nothing more than that. Is that a fair assessment of what you have in the record that would support that hostile work environment claim? We also argued, Your Honor, below and here, that as part of that hostile work environment claim, the denial of accommodations, which is a separate claim, contributed to that hostile work environment. But they granted him the accommodation. Yeah, sure, they slipped up three or four times, but when he called it to their attention, they backed, no one forced him to do it after he called it to their attention. Actually, they kept coming, Your Honor, with the lifting. Judge Woodlock said there were three instances documented in the record. Your brief says there were four. I disagree with there were three, Your Honor. I think he may have discounted two of them as well and considered one of them as possibly viable. But on pages 230, I just wanted to highlight on pages 239 and 267 of the appendix, and we've argued this in our brief, there were other instances within the last six months of his employment there where Mr. Murray was required to lift heavy cables and heavy tools, and he complained about that protected activity. And then on May 27th as well, Your Honor, I don't think Judge Woodlock addressed this. May 27th, 2011, just a few days before his termination, he was required to handle a large shipment required to walk long distances in violation of his restrictions, and actually filed an injury report as a result of that incident. So that was another instance of violation of his accommodation requests and restrictions. And so I think with the comments, Your Honor, as well as the denial of accommodations, which clearly contributed to a hostile work environment, there's enough fact there for a jury to decide. I did want to make one last final point very quickly, and that is on the retaliation piece, if you consider the protected activity that we just discussed, and the complaining about making him do things against his restrictions, shortly thereafter, and we're again within this three and a half month window before his termination, from February 17th to June 1st, these things are happening, the denial of accommodations. Some of the comments were made, and Judge Woodlock basically looked at the temporal proximity of the protected activity in the June 1st termination date, and said he didn't see it, basically. It wasn't close enough, or clear enough. And I think it is clear enough. I think that you do have protected activity within that short window of time, and I've cited the case law in my brief, Your Honors, that addresses that temporal proximity, but you also have to look at the pretext evidence, meaning the other evidence, not just the timing between the protected activity and the adverse action, the termination, but was the termination legitimate? And here we, and I'll just say it one more time, we have an instance, a rare case, actually, in my view, where, you know, he says that he was terminated, and they say that he was, he had quit. Thank you. Thank you. May it please the Court, Mark Batten, Your Honors, for Warren Pumps. I'm turning first to the public policy argument. My brother spoke repeatedly about the nature of the complaints being significant, but the fact is that the complaints here don't rise to the level that has been repeatedly found necessary in the case law to sustain a claim for termination on the basis of public policy. It either has to be, involve criminal behavior, or it has to involve behavior that affects public health or safety. Not employee safety, which is by far the vast majority of the issues that were raised by Mr. Murray throughout his employment. There frankly are no cases, interestingly, I couldn't find a single case in Massachusetts involving complaints about OSHA violations, other than one in which the employee asked to see a material safety data sheet with respect to a chemical that he was using in his work, a case called Mitchell versus Tech, Tech Services. He was fired. He claimed that he was fired because of his request for the data sheet, and the Court said that's not enough to get to the level that's required for this very narrow exception to the at will rule. Many of Mr. Murray's complaints involved employee safety, but none of them involved a threat to public safety, much less criminal behavior. And in a Massachusetts case called Mello versus Stop and Shop, which is cited in our papers, the employee complained about three different matters involving damage claims by suppliers to the Stop and Shop companies. The Court said two of those don't rise to the level necessary to sustain a public policy claim. The third one might, but we don't even have to reach that question because there's no way that a jury could distinguish one from the other. So even if Mr. Murray were able to convince this Court that one or two of the matters that he complained about did rise to the requisite level, simply the fact that he had such a flood of complaints, most of which plainly don't satisfy the case law, is enough to sustain summary judgment because there's no other evidence on which a jury could say, you know, he was fired because of the electrical complaint or the welding complaint or whatever you choose. There's simply a welter of complaints and then the jury is asked to say that's why he was fired. Second, going to Judge Selye's point about Mr. Murray's job, he is responsible for safety. It's his job to report issues. And we can't exempt an entire class of employees from termination because they're doing things that may rise to the level of protected activity. Mr. Shea told the Court that the way we should distinguish and the way we should create a workable standard is to look at the nature of the complaints. That's entirely unworkable because a safety employee's job, a compliance officer's job is to report what he sees. And if it's a serious violation, he should report that at least as much as he would report some minor violation. And we can't have the public policy, the existence of a public policy claim turn on the seriousness of the complaints that are made in terms of proving causation because the employee is just going to report what he reports. And whether the employer takes that overly seriously or not seriously enough has nothing to do with the motivation question that is essential to causation. So what the courts have said, as we've explained in our brief, is that for a safety employee to mount a public policy claim, he's got to come up with at least something more than temporal proximity between his complaints and the adverse action. And even assuming that there was an adverse action here, that's all that Mr. Murray has is temporal proximity. So he has no claim. With respect to the failure to accommodate the handicap claim, it's undisputed on this record that nearly all, that all of the accommodations that Mr. Murray requested were granted. And the dispute really only centers around these four alleged instances in which Mr. Korczak, as Mr. Murray says, asked him to go against his restrictions. But even those, a mere four incidents over a period of a couple of years, actually don't sustain much scrutiny. One of the four was a request to paint, which he refused. Mr. Murray said, I can't do that. I'm not going to do it. And there were no consequences from that. In the second instance, he was asked to do some wiring. He said, I can't lift the toolbox. Mr. Korczak didn't say, do it anyway. He said, find a way to get it done. And Mr. Murray testified in his deposition, I pulled somebody else off the floor to do it. That's the appendix at page 249. So he got help, which is what Mr. Korczak permitted him to do. Again, he wasn't required to go against his restrictions, although he did testify that he carried the toolbox in that instance. He was asked one time apparently to take in a shipment, but he didn't object to doing so. He didn't tell Mr. Korczak, you know, that shipment is too heavy. I can't lift it. And when asked in his deposition why not, he said, well, I had said it in the past. I thought that would be good enough. So in this third instance, he didn't even object to what he was being asked to do. And then finally, this issue on May 27th, shortly before he was terminated, when he was in charge of a project that he says required him to walk too much from one end of the plant to the other, it's not even clear on this record that he was instructed to do that. He says that he was forced to take charge of it because everyone else had been released for the weekend or the holiday, but it was not even clear that anyone asked him to do it. He may, in fact, on this record have volunteered. Finally, with respect to the retaliation claim, again, Mr. Murray relies entirely on questions of, or issues of temporal proximity, but he can't establish any conduct, protected conduct with that respect that's close in time to the issues that he, or to his termination. So for all these reasons, the district court went through quite a substantial record. A lot of disputes of fact found them not to be material. That judgment should be affirmed. The district court, Mr. Bennett made, wrote at some length about what it perceived as the differences between Massachusetts law and current federal law insofar as how a disability may be defined or what the scope of disability discrimination may be. Do you think that we have to get into that swamp, and if we do, do you think that the district court got it right? No, you don't have to get into that swamp, Your Honor, because the district court went on to find that Mr. Murray was disabled for purposes of federal law, at least. And if I'm going to win an affirmance in this case, I'm going to have to move beyond that. And because Mr. Murray was accommodated, there's not sufficient evidence of any failure to accommodate, and there's not any sufficient evidence that he was retaliated against for requesting accommodations, it really doesn't matter in the last analysis for purposes of this appeal whether he was sufficiently disabled or not. We can assume that he was, and there was, in that case, no violation. Thank you. That's helpful. Unless there are other questions. Thank you.